[No. H018266. Sixth Dist. Feb. 25, 2000.]

JAMES BURROUGHS et al., Plaintiffs and Appellants, v.
PRECISION AIRMOTIVE CORP., Defendant and Respondent.

682

**COUNSEL**

Wolff, Ellis & Clausen, Gerald Clausen; Abramson & Smith and Albert R. Abramson for Plaintiffs and Appellants.

Mendes & Mount, James W. Hunt and Mark R. Irvine for Defendant and Respondent.

Shea & Gardner, Richard M. Sharp, Frederick C. Schafrick; Coddington, Hicks & Danforth, Clinton H. Coddington and Richard G. Grotch for General Aviation Manufacturers Association as Amicus Curiae on behalf of Defendant and Respondent.

Harvey M. Grossman for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, Acting P. J.**—Plaintiffs suffered injuries in the crash of a light aircraft, allegedly due to a malfunction in the engine's carburetor. Defendant is an aircraft parts manufacturer who did not manufacture or sell this particular model of carburetor but acquired the product line from a predecessor who had acquired it from the original manufacturer. The carburetor was manufactured and sold in 1968, over 25 years prior to the accident. A recent federal statute of repose (The General Aviation Revitalization Act of 1994 (GARA), Pub.L. No. 103-298, 108 Stat. 1552, 49 U.S.C. § 40101 note) bars claims arising from accidents involving light aircraft brought against "the manufacturer of any new component . . . or other part of the aircraft, in its capacity as a manufacturer" (Pub.L. No.

103-298, § 2(a), 108 Stat. 1552) more than 18 years after the product is first sold. The trial court in this case granted summary judgment against plaintiffs, finding that the federal statute barred their claims against defendant in its capacity as successor to the original manufacturer.

Two questions are presented in this appeal. Is defendant a "manufacturer" within the meaning of the federal statute? If the statute applies to bar plaintiffs' claims against defendant acting in its capacity as a manufacturer, can plaintiffs nonetheless proceed against defendant on a theory that defendant breached an independent duty to warn about the defective product? We find that defendant, as the successor manufacturer, stands in the shoes of the manufacturer and is entitled to the protection of GARA. We further find that defendant, in engaging in the conduct complained of by plaintiffs, was acting in its capacity as a manufacturer pursuant to the duties and obligations imposed by federal law on manufacturers of general aviation aircraft and aircraft parts. Plaintiffs' theory of independent liability is not viable under these circumstances. We therefore affirm the judgment.

### BACKGROUND

On February 26, 1995, a two-seater aircraft piloted by plaintiff James Burroughs took off from Reed-Hillview Airport in San Jose. The passenger was plaintiff Jared Burroughs, James Burroughs's nephew. Shortly after takeoff, the aircraft lost power and crashed. Both James and Jared Burroughs suffered serious personal injuries. Plaintiff Joseph Burroughs, father of Jared, witnessed the crash from the ground.

Plaintiffs' expert stated that the source of the plane's losing power was a defective carburetor containing a float made from composite materials. Over time and with changes in the chemistry of gasoline, the composite float absorbed fuel and became heavy. The float's loss of buoyancy caused a change in the fuel-air mixture, resulting in interruption of power. The carburetor, known as the Marvel-Schebler Aviation carburetor, or MSA carburetor, model MA-3A, was manufactured in 1968 by the Marvel-Schebler Division of Borg-Warner Corporation (now known as Borg-Warner Security Corp., hereafter Borg-Warner). Borg-Warner sold its Marvel-Schebler carburetor line to Facet Aerospace Products Co. in 1983 (a subsidiary of Facet Enterprises, Inc., hereafter Facet). Facet sold the Marvel-Schebler product line to Zenith Fuel Systems, Inc., in 1990, and shortly thereafter defendant Precision Airmotive Corp. (Precision) acquired the product line. Although Precision began manufacturing aircraft carburetors in 1991, it did not manufacture, design or sell the model of carburetor involved

in the accident in this case. Production of this particular carburetor containing the composite float ceased in 1984, six years before Precision acquired the product line.

Problems with composite carburetor floats absorbing fuel and sinking were well documented. Facet issued a service bulletin in May of 1984 to "All Outlets," recommending the replacement of composite floats with metal floats in all Marvel-Schebler carburetors "at next overhaul or immediately." Later that year, in August of 1984, Facet requested that the Federal Aviation Administration (FAA) issue an airworthiness directive relating to the replacement of composite floats in Marvel-Schebler carburetors. An airworthiness directive (AD) is a finding by the FAA of an unsafe condition in a product and it orders corrective action with which aircraft owners must comply. A notice of proposed rulemaking appeared in the Federal Register proposing the adoption of an AD that would require all carburetor composite floats to be replaced with metal floats by 1988. The notice stated that "the FAA has determined that composite carburetor floats are absorbing fuel and becoming less buoyant, thus adversely affecting the carburetor's ability to control fuel level, leading eventually to carburetor flooding." The notice further stated that Facet, which had purchased the Marvel-Schebler carburetor line, had obtained a design change which would reintroduce a metal float compatible with the chemistry of current blends of aviation gasoline. Facet had available a replacement kit for approximately $57, which would require approximately four hours to install. Although this notice was published in the Federal Register, the AD was not adopted by the FAA.

In June of 1990, Facet renewed its request for an AD. In its letter to the FAA, Facet noted that there continued to be incidents of saturation of composite floats due to increased use of low lead fuels and autogas. Facet estimated that it had sold approximately 75,000 replacement kits but that there were still approximately 83,000 composite floats in the field. Facet urged the issuance of an AD requiring the replacement of the composite floats remaining in the field. The engine manufacturer, Textron-Lycoming, Inc., supported the request.

Shortly thereafter, in July of 1990, Precision acquired the Marvel-Schebler product line. In October of 1990, Precision issued a "Mandatory Service Bulletin" (No. MSA-1) "to clarify time of compliance for replacement of the carburetor float and to reflect acquisition of the Facet Aerospace product line (Marvel Schebler Aviation Carburetors) by Precision Airmotive Corporation." The bulletin noted that reports from the field indicated that composite floats "may be absorbing fluid and sinking." It stated that Precision considered it was "mandatory" to replace the composite floats with metal floats

"within the next 90 days or 25 hours of engine operation" if the aircraft was experiencing a flooding carburetor, rough engine or inconsistent engine shutdown. The bulletin provided information about metal float replacement kits which were available from local distributors. Finally, it noted that that an AD had been requested of the FAA. This bulletin was sent to aircraft repair stations and maintenance personnel and to Textron-Lycoming, manufacturer of the engine.

In September of 1991, the AD had not been issued and Precision wrote again to the FAA requesting the issuance of an AD requiring replacement of composite floats with metal floats in all Facet/Marvel-Schebler carburetors. The letter stated: "As the new manufacturer of the Facet/Marvel Schebler carburetor, Precision Airmotive feels very strongly that the composite floats constitute a significant safety of flight problem and must be removed from service." Randy Jenson, manager of engineering and product support for Precision, met with a representative of the FAA regarding the AD requested for replacement of the composite float and two other AD's requested by Precision.

Thereafter, in November of 1991, Precision sent out a new service bulletin package, with a revised Mandatory Service Bulletin No. MSA-1, to all repair stations and maintenance personnel. This package included a cover letter informing the recipient that Precision was now the original equipment manufacturer (OEM) of the Marvel-Schebler carburetor, having purchased the product line from Facet. Revised No. MSA-1 required that the Marvel-Schebler composite float be removed "immediately" and replaced with a metal float as per the instructions in the replacement kit.

The FAA once again declined to issue an AD regarding the replacement of the composite float with a metal float. The FAA informed Precision in July of 1992 that after reviewing service difficulty records it had concluded that "there was not significant difference in the problems associated with the composite or metal floats and that regulatory action was not warranted at this time."

Vern Miller, the mechanic for the aircraft in question in this case, stated that he was aware of reports of composite floats absorbing fuel and sinking and that he had received the Mandatory Service Bulletins issued by Precision. However, when he conducted the annual inspection of the aircraft in September of 1994, just months before the accident, he did not inspect the carburetor to see if it had a metal or a composite float. He did not feel it was necessary to comply with the Mandatory Service Bulletins because he did

not believe the bulletins constituted an "airworthiness requirement." He performed the annual inspection and certified the aircraft as airworthy.

The owner of the aircraft, David Gray, stated that he did not receive a copy of No. MSA-1 from Precision. In September of 1993, he did receive a notice sent by Textron-Lycoming, Inc., informing him of the active service publications which could pertain to the model of engine in his airplane. This notice suggested that he have his maintenance facility review the list of service bulletins for their relevance to his specific model of engine. The notice further explained that service bulletins "describe mandatory procedures that must be observed for safety reasons . . . ." It advised him to "please make sure you have complied with each of [the Service Bulletins.]" The notice then listed 20 active service bulletins, including the No. MSA-1 issued by Precision. However copies of these service bulletins were not attached to the notice. Gray stated that he expected his mechanic, Vern Miller, to be familiar with the mandatory service bulletins and to comply with them during his annual inspection.

Plaintiffs sued Gray, Miller (doing business as Vern Miller Aviation), Precision, and Textron-Lycoming, Inc. The complaint was amended to add defendant Borg-Warner. Plaintiffs alleged theories of negligence, strict liability and breach of warranty relating to the design, manufacture and maintenance of the aircraft's engine and carburetor. Motions for summary adjudication by Borg-Warner and Textron-Lycoming were granted as to all three causes of action of plaintiffs James and Jared Burroughs on the ground that their claims were time-barred under the provisions of the federal GARA (Pub.L. No. 103-298, 108 Stat. 1552, 49 U.S.C. § 40101 note). That statute provides for an 18-year limitations period for lawsuits against manufacturers of general aviation aircraft or component parts of such aircraft. The court likewise granted Precision's motion for summary adjudication under GARA as to the theories of strict liability and breach of warranty on the ground that Precision was a successor to the manufacturer of the carburetor, but the court denied Precision's motion as to the negligence cause of action, finding that, "liberally construed," the complaint stated a cause of action for negligence on a theory of product support.[1]

Thereafter, Precision filed a second motion for summary adjudication as to the remaining cause of action for negligence of plaintiffs James and Jared Burroughs on grounds that 1) this was a product liability claim which was barred and preempted by GARA, 2) Precision owed no independent duty

---

[1] It is represented that plaintiffs settled their case with both Vern Miller, the mechanic, and David Gray, the owner of the aircraft.

with regard to the product, and 3) even if it had a duty, Precision satisfied that duty by issuing the service bulletins. The court granted the motion for summary adjudication, finding that Precision, as a successor to the original manufacturer of the product, was entitled to the protection of GARA and that any duty to warn was the same duty owed by the original manufacturer and not an independent duty. Judgment was entered in favor Precision.

ANALYSIS

*Standard and Scope of Review*

■ A defendant is entitled to summary judgment only if he or she establishes as a matter of law that none of plaintiff's asserted causes of action can prevail. (Code Civ. Proc., § 437c, subd. (c).) On appeal from a summary judgment, we conduct an independent review, applying the same three-step process as the trial court. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) We first look to the pleadings to identify the elements of the cause of action for which relief is sought. We then examine the moving party's motion to see whether it shows " 'that one or more elements of the cause of action . . . cannot be established or that there is a complete defense to that cause of action.' " (*Union Bank v. Superior* Court (1995) 31 Cal.App.4th 573, 583 [37 Cal.Rptr.2d 653]; Code Civ. Proc., § 437c, subd. (o)(2).) If the moving party has made the requisite showing, the burden shifts to the party opposing the motion to set forth specific facts "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2); *Union Bank v. Superior Court, supra,* 31 Cal.App.4th at p. 590; *Barton v. Elexsys Internat., Inc.* (1998) 62 Cal.App.4th 1182, 1187 [73 Cal.Rptr.2d 212].) If the opposing party fails to sustain this burden, summary judgment is proper. (Code Civ. Proc., § 437c, subd. (n)(2); *Union Bank v. Superior Court, supra,* 31 Cal.App.4th at p. 593.)

■ The proper interpretation of a statute is a question of law, subject to our independent review (*Simpson v. Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 350 [231 Cal.Rptr. 690]), as is the application of a statute to undisputed facts. (*Bullock v. City & County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094-1095 [271 Cal.Rptr. 44].)

We note that these summary proceedings applied only to plaintiffs James and Jared Burroughs. We note further that plaintiffs have not appealed the previous summary adjudication in favor of Precision on their causes of action for strict products liability and breach of warranty. ■ Therefore the only cause of action at issue in the summary adjudication motion we

review is a cause of action against Precision for negligence. This was pleaded generally in plaintiffs' first cause of action, which alleged that the accident was "caused by defendants because they carelessly and negligently owned, operated, furnished, rented, designed, manufactured, assembled, supplied, sold, maintained, inspected, overhauled and gave instructions as to the use and operation of [the aircraft], its engine, carburetor and components." More particularly, the theory of plaintiffs' negligence claim against Precision is that Precision failed to adequately warn customers of the Marvel-Schebler carburetor about its defects by not sending the relevant service bulletins directly to the aircraft owner.

*The General Aviation Revitalization Act of 1994*

Defendant and two amici curiae, the General Aviation Manufacturers Association and the Product Liability Advisory Council, Inc., argue that the federal act, GARA, bars any claim against Precision, by virtue of its assumption of the duties imposed by federal law on the manufacturer of an aircraft or component part.

In pertinent part, GARA provides that "no civil action for damages or death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft[2] may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred . . . [more than 18 years after the date of delivery of the aircraft and/or component to the first purchaser or lessee]." (GARA, Pub.L. No. 103-298, § 2(a), 108 Stat. 1552.)

GARA established a " 'statute of repose to protect general aviation manufacturers from long-term liability in those instances where a particular aircraft has been in operation for a considerable number of years. A statute of repose is a legal recognition that, after an extended period of time, a product has demonstrated its safety and quality, and that it is not reasonable to hold a manufacturer legally responsible for an accident or injury occurring after that much time has elapsed.' " (*Altseimer v. Bell Helicopter Textron, Inc.* (E.D.Cal. 1996) 919 F.Supp. 340, 342, quoting 140 Cong. Rec. H4998, H4999 (Daily ed. July 27, 1994).) A statute of repose differs from a statute of limitations in that statutes of limitation bar suits filed more than a specified period of time after an injury occurs or is discovered, whereas a

---

[2]A "general aviation aircraft" is defined as any aircraft for which an "airworthiness certificate" has been issued by the FAA, which has a maximum capacity of fewer than 20 passengers and is not, at the time of the accident, engaged in scheduled passenger-carrying operations. (Pub.L. No. 103-298, § (2)(c), 108 Stat. 1552.)

statute of repose is a bar on all suits brought more than a specified period after the date of manufacture of a product and delivery to the purchaser. Because the date of injury is not a factor used in computing the running of the time period and because statutes of repose typically do not have tolling provisions, they "acquire a substantive nature, barring rights of action even before injury has occurred if the injury occurs subsequent to the prescribed time period." (*Wayne v. Tennessee Valley Authority* (5th Cir. 1984) 730 F.2d 392, 402; *Alexander v. Beech Aircraft Corp.* (10th Cir. 1991) 952 F.2d 1215, 1223.)

GARA expressly preempts state law. Section 2(d) provides that "This section supersedes any State law to the extent that such law permits a civil action described in subsection (a) to be brought after the applicable limitation period for such civil action established by subsection (a)." (GARA, Pub.L. No. 103-298, § 2(d), 108 Stat. 1552.)

The legislative history of GARA indicates that it was passed in response to a serious and "precipitous" decline in the manufacture and sale of general aviation aircraft by United States companies, caused in part by the tremendous increase in the industry's liability insurance. (GARA, H.R. No. 103-525(II), 103d Cong., 2d sess. (1994) p. 1646; *Campbell v. Parker-Hannifin Corp.* (1999) 69 Cal.App.4th 1534, 1545 [82 Cal.Rptr.2d 202].) By establishing a statute of repose of 18 years, GARA was intended "to limit excessive product liability costs, while at the same time affording fair treatment to persons injured in general aviation aircraft accidents." (GARA, H.R. No. 103-525(I), 103d Cong., 2d sess., *supra*, p. 1638.) Studies indicated that "nearly all defects are discovered during the early years of an aircraft's life" and only a small percentage of general aviation accidents are caused by design or manufacturing defects. (*Id.* at p. 1640.) Furthermore, products in the aircraft industry are highly regulated "to a degree not comparable to any other [industry]." (GARA, H.R. No. 103-525(II), 103d Cong., 2d sess., *supra*, p. 1647.) Manufacturers are required to report any incidents indicating product defects to the FAA, which has the responsibility for ordering corrective action if defects are revealed after an aircraft design is approved. Moreover, the older an aircraft gets, the more likely it is to have had a number of owners and to have undergone modifications, overhauls and other maintenance procedures. This makes it increasingly difficult as time passes to determine whether the manufacturer or some other person who used or repaired the aircraft was primarily responsible for a mechanical failure. Nonetheless suits were frequently filed against the original manufacturers of aircraft and component parts long after the aircraft or part had been in use and had demonstrated its safety. Manufacturers incurring substantial expenses settling or defending these cases were being driven out of business.

Relief from this long "tail" of liability, it was believed, would revitalize the industry and result in an increase in jobs, enable manufacturers to spend more on research and development, and enhance manufacturers' ability to compete with foreign companies. (GARA, H.R. No. 103-525(I), 103d Cong., 2d sess., *supra*, p. 1641.)

The statute does not apply if manufacturers fail to fulfill their obligations to report known defects or other safety information to the FAA. (GARA, Pub.L. No. 103-298, § 2(b)(1), 108 Stat. 1552.) It also does not provide protection for a manufacturer acting in any other capacity than "as a manufacturer." (GARA, § 2(a).) For example if the manufacturer committed a negligent act repairing or servicing an aircraft or as a pilot, and such act was the proximate cause of an accident, the victims would not be barred from bringing suit against the manufacturer acting in a capacity other than as a manufacturer. There are also exceptions in the statute for passengers being transported for medical emergencies and persons injured on the ground or in other aircraft. (GARA, § 2(b)(2), (3).)

Another perceived element of fairness in the legislation is that GARA is a "rolling" statute of repose. When any part or subassembly in an aircraft is replaced with a new part, a new 18-year period begins for that part from the date it is installed. (GARA, Pub.L. No. 103-298, § 2(a)(2), 108 Stat. 1552; GARA, H.R. No. 103-525(II), 103d Cong., 2d Sess., *supra*, p. 1647.) Since almost every major component of the aircraft will be replaced over its lifetime, the "rolling" aspect of the statute of repose was intended to provide that victims and their families would have recourse against the manufacturer of the new component part in the event of a defect in the new part causing an accident.

Given all of these considerations, "[t]he legislation attempts to strike a fair balance by providing some certainty to manufacturers, which will spur the development of new jobs, while preserving victims' rights to bring suit for compensation in certain particularly compelling circumstances. In essence, the bill acknowledges that, for those general aviation aircraft and component parts in service beyond the statute of repose, any design or manufacturing defect not prevented or identified by the Federal regulatory process by then should, in most instances, have manifested itself." (GARA, H.R. No. 103-525(II), 103 Cong., 2d Sess., *supra*, p. 1648.)

Applying GARA to the facts before us, its provisions clearly shield the manufacturer of the carburetor Borg-Warner and the engine Textron-Lycoming, Inc., from liability for claims based on any defect in the Marvel-Schebler carburetor. Plaintiffs do not argue otherwise. The particular model

of carburetor was manufactured and sold in 1968, over 25 years prior to the accident.

Plaintiffs claim that GARA does not apply to Precision, however, because Precision is not the "manufacturer" of the carburetor. The term "manufacturer" is nowhere defined in GARA, and GARA does not specifically include successor manufacturers within the protection of the statute. Although Precision did not actually manufacture the particular carburetor in this case, it is a manufacturer of general aviation aircraft parts,[3] including carburetors, and it took over the manufacturer's responsibilities for the Marvel-Schebler product line. Precision is part of the general aviation industry which GARA was specifically enacted to "revitalize," as the title of the act indicates, and Precision is thus precisely the type of entity GARA was designed to protect from the long tail of liability. The central objective of GARA would be materially undermined if its protection did not apply to a successor to the manufacturer who, as part of its ongoing business, acquired a product line long after the particular product had been discontinued and years after the statute of repose had run as to the original manufacturer. To construe GARA to allow liability claims against the successor manufacturer in these circumstances while barring the same claims against the actual manufacturer would defeat its purpose. We conclude, as we explain further below, that if GARA applies to shield the original manufacturer of a defective product from product liability claims such as the failure to warn alleged here, a successor manufacturer who has taken over the duties and obligations of the original manufacturer as to that product is also protected from liability for such claims.

Plaintiffs appear to concede the logic that "GARA, which would immunize the manufacturer from liability for failure to warn, would also immunize a successor to the extent it has assumed such liability from the manufacturer." Plaintiffs refer here to the rules of successor liability under California state law, which provides for a successor's assumption of liability for torts of a predecessor only in limited circumstances, which do not apply here. (See *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 34 [136 Cal.Rptr. 574, 560 P.2d 3].) Because of the preemptive reach of GARA, however, California law relating to successor liability does not govern if it would allow a claim otherwise barred by GARA. (GARA, Pub.L. No. 103-298, § 2(d), 108 Stat. 1552.) In other words, GARA cannot be interpreted by reference to state law. Rather the question is whether Precision assumed the obligations and duties of the manufacturer, as well as liability for a breach of those duties, under the relevant federal law.

---

[3]"General aviation" is all civil aviation activity except for scheduled commercial carriers.

We believe GARA contains an implicit recognition that as a matter of federal law, by virtue of the extensive rules and regulations governing the aviation industry, a successor manufacturer steps into the shoes of the predecessor with regard to the duties of reporting defects. The drafters of GARA recognized that the aircraft industry is unique because of the extensive "cradle to grave" federal regulatory oversight of the industry. (GARA, H.R. No. 103-525(II), 103d Cong., 2d Sess., *supra*, p. 1647.) For instance, a holder of a parts manufacturer approval (PMA), such as Precision, must report to the FAA "any failure, malfunction, or defect in any product, part, process or article manufactured by it" that has resulted or could result in an incident such as engine failure. (14 C.F.R. § 21.3 (1999).) Precision, as the holder of the PMA on the Marvel-Schebler line of carburetors, was obliged to comply with these reporting requirements even though technically the particular model of carburetor in question here was not "manufactured by it." Applicable regulations regarding maintenance, preventive maintenance, and alterations of aircraft provide that the manufacturer's instructions for continued airworthiness are to be followed as contained in the maintenance manuals, service bulletins, service letters and service instructions. (14 C.F.R. § 91.403(c) (1999).) Again, after Precision took over the Marvel-Schebler carburetor line in 1990, it became the entity responsible for issuing these manuals and bulletins and fulfilling *the manufacturer's* obligations for continued airworthiness. In the eyes of the FAA, Precision was the "new manufacturer" of the Marvel-Schebler carburetor.

As plaintiffs' expert explained, when Precision purchased the Marvel-Schebler carburetor product line in 1990, "it became the Original Equipment Manufacturer ('OEM'). In the aviation field, this means that it [Precision] now stands in the same shoes as the two prior companies with respect to providing service information and replacement parts for existing carburetors . . . It was the only source of FAA-approved service bulletins and instructions, maintenance manuals, parts catalogs and replacement parts." Thus Precision took over the manufacturer's obligations "with respect to continuing airworthiness" of the Marvel-Schebler product line. (See GARA, Pub.L. No. 103-298, § 2(b)(1), 108 Stat. 1552.) It obtained and became the holder of a PMA issued by the FAA, and it identified itself in its service bulletins and to the FAA as the new OEM for the Marvel-Schebler float carburetor.

The federal regulatory scheme contemplates that at all times there will be a designated OEM for an aircraft part or component, burdened with the reporting duties and responsibilities as to that particular product. Here Precision was the entity which assumed those duties with respect to the MSA model carburetor in this case. As a successor to the Marvel-Schebler

product line of Borg-Warner (through Facet and Zenith), Precision became the OEM, or "manufacturer," of that product, within the meaning of aviation law in general and GARA in particular. Nothing in GARA provides or suggests that a successor's acquisition of a product from the original manufacturer tolls or restarts the 18-year statute of repose as to the new OEM. The running of the statute of repose is determined by reference only to the date the product was originally manufactured and purchased. The only "rolling" aspect of the statute is where a new replacement part or component is installed in the aircraft.

To the extent that Precision, as the OEM for the Marvel-Schebler product assumed and carried out the duties of the previous OEM's, we believe it is entitled to the protection of the statute of repose applying to claims against manufacturers based on a breach of those duties. In other words, GARA would shield Precision from liability as to any claim against it "in its capacity as a manufacturer" of the product (GARA, Pub.L. No. 103-298, § 2(b)(1), 108 Stat. 1552). This includes claims based on the alleged failure to deliver adequate warnings of known defects. (*Alter v. Bell Helicopter Textron, Inc.* (S.D.Tex. 1996) 944 F.Supp. 531 (*Alter*); *Campbell v. Parker-Hannifin Corp., supra,* 69 Cal.App.4th at p. 1546.) In *Alter*, the plaintiffs alleged that a component part of a helicopter engine had a propensity to prematurely fatigue and fail. The accident occurred more than 18 years after the engine component was manufactured and delivered. The plaintiffs' theory of the case was that the defendant failed to issue adequate and understandable instructions in its maintenance manual, warning that the part had to be checked in order to determine the extent of its wear. They claimed that GARA should not apply because the manufacturer delivered inadequate information and warnings during the repose period. The court rejected this argument. Reviewing other state statutes of repose similar to GARA, the court concluded that "the manufacturer's provision of maintenance and repair manuals was part of its duty to warn as a manufacturer. The statutes of repose extinguished the manufacturers' liability arising from this duty the specified number of years after the first delivery of the product." (*Alter, supra,* 944 F.Supp. at pp. 540-541.) Therefore, the court concluded, GARA "precludes the possibility that plaintiff could establish a cause of action . . . for defective marketing or failure to warn against [defendant] based on allegedly misleading inspection instructions in the maintenance manual that failed to warn or allow detection of the design flaw." (*Id.* at p. 541; see also *Campbell v. Parker-Hannifin Corp., supra,* 69 Cal.App.4th at p. 1547 ["the GARA limitation period may not be circumvented simply by labeling the claim as one for failure to warn"].)

In our case the GARA period of repose for the Marvel-Schebler carburetor elapsed in 1986, almost 10 years before the injury occurred and four years

before Precision purchased the product line and succeeded to the obligations and duties imposed upon its predecessors by the various rules and regulations governing the aviation industry. To the extent that Precision was acting in its capacity as manufacturer of the product within the meaning of federal law, we conclude that GARA applies to bar a claim against it for a defect in the carburetor based on any theory of product liability, including a continuing duty to warn.

### Independent Liability

Plaintiffs contend that even if Precision cannot be held derivatively liable for breaching a duty to warn assumed from its predecessors, Precision can nonetheless be liable for a failure to warn independent of its status as a successor manufacturer, in which case it would be outside the reach of GARA. Plaintiffs argue that this theory of independent liability applies here because Precision established an ongoing relationship with purchasers of the Marvel-Schebler carburetor, from which it derived an economic benefit, and because it was aware of known defects in the carburetor. Thus it had a duty to warn those customers of the defects. Precision breached this duty, they contend, by failing to send its Mandatory Service Bulletins directly to owners of aircraft with engines containing the Marvel-Schebler carburetor, a list of whom is readily available from the FAA.

Although California has not expressly adopted this independent duty to warn theory of liability, other jurisdictions, as well as the Restatement of Law, have recognized it. (*Patton v. TIC United Corp.* (10th Cir. 1996) 77 F.3d 1235, 1240-1241 (*Patton*); *Gee v. Tenneco Inc.* (9th Cir. 1980) 615 F.2d 857, 866 (*Gee*); *Schumacher v. Richards Shear Co., Inc.* (1983) 59 N.Y.2d 239 [464 N.Y.S.2d 437, 451 N.E.2d 195, 199]; Rest.3d Torts, Products Liability, § 13.) In *Patton,* the plaintiff was injured by a farm cultivator manufactured by a company called Wil-Rich, which was eventually taken over by TIC. The plaintiff brought a products liability action against TIC, and various of its predecessors, alleging that TIC, although it was not the manufacturer of the product, incurred a duty as a successor to the Wil-Rich product line to warn owners of the product when it learned about accidents of the same type as the plaintiff's. The court in *Patton* determined that under Kansas law a successor entity may incur a postsale duty to warn if it has knowledge of the defective condition of the predecessor's product and has a " 'more than casual' " relationship with the customers of the predecessor entity that provides an economic benefit to the successor. (*Patton, supra,* 77 F.3d at p. 1240.) Such a duty could be found on evidence that TIC knew of serious injuries to other operators of this cultivator and that it benefited economically from its relationship with Wil-Rich customers because it

continued to market the cultivators under the trade name of Wil-Rich through its authorized Wil-Rich dealership. (*Id.* at pp. 1240-1241.)

In *Gee, supra,* 615 F.2d 857, the Ninth Circuit considered a similar issue and came to a different result on the basis that the relationship between the successor and the customer of the product was insubstantial. In *Gee,* the defendant was the last in a succession of companies, the first of which had manufactured the chemical substance plaintiff claimed caused her husband's death. Neither the defendant nor its immediate two predecessors had ever engaged in the manufacture or sale of the product. The plaintiff argued that apart from any liability as a successor company, the defendant acquired an independent duty to warn of the potential dangers of the product when it became aware of the tendency of the chemical substance to cause serious disease. The Ninth Circuit noted that there was no California law bearing directly on the issue of a successor corporation's independent duty to warn of defects in products manufactured by a predecessor. However, examining law of other jurisdictions, the court concluded that the district court had not erred in not imposing such a duty in the circumstances before it.

The court in *Gee* found that "a successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention." (*Gee, supra,* 615 F.2d at p. 866.) However succession alone does not impose this duty. What is required is evidence showing "the continuation of the relationship between the successor and the customers of the predecessor." (*Ibid.*) Factors which may be considered in order to determine if a nexus or relationship sufficient to create a duty to warn exists are whether the successor assumed the predecessor's service contracts, whether the particular product was covered under a service contract with the predecessor's customer, whether the successor actually serviced the product, and whether the successor knew of the alleged defects and knew how to reach the predecessor's customers. (See also *Leannais v. Cincinnati, Inc.* (7th Cir. 1977) 565 F.2d 437, 449.) In the *Gee* case, the court found that there was no relationship between the defendant and the users of the product, including the plaintiff's decedent, and that the defendant derived no economic benefit from the product. In the absence of a "more substantial relationship," the court found, a California court would not impose a duty to warn. (*Gee, supra,* at p. 866.)

A New York court in *Schumacher v. Richards Shear Co., Inc., supra,* 451 N.E.2d 195, also recognized that a manufacturer, apart from liability deriving from its status as a successor, could be liable "under general tort rules." (*Schumacher, supra,* at p. 199.) Tort law provides generally that "a person

may be negligent because he or she fails to warn another of known dangers or, in some cases, of those dangers which he had reason to know. The duty commonly is imposed because of some special relationship, frequently economic . . . ." (*Id.* at p. 199.) The court noted that other jurisdictions acknowledging such a theory of recovery have "focussed upon the relationship between the defendant 'successor' corporation and the customers of the predecessor and the actual or potential economic advantage to the defendant successor corporation." (*Ibid.*) The court in *Schumacher* concluded in that case that there was evidence of contacts between the successor corporation and the plaintiff's employer, knowledge of the defect, and potential economic advantage sufficient to create a triable issue as to whether a relationship existed which would give rise to a duty to warn.

As further support for their theory that tort law generally recognizes a successor company's duty to warn of known defects in a predecessor's product, plaintiffs rely on the Restatement Third of Torts, Product Liability, section 13. That section provides that a successor company may be subject to liability for harm caused by its failure to warn of a risk created by a product sold or distributed by the predecessor if "the successor undertakes or agrees to provide services for maintenance or repair of the product or enters into a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor," and if "(1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and [¶] (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and [¶] (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and [¶] (4) the risk of harm is sufficiently great to justify the burden of providing a warning." (Rest.3d Torts, Products Liability, § 13, subd. (b).)

Plaintiffs argue that under this theory of liability they made a sufficient factual showing, in opposition to Precision's motion, to create a triable issue as to whether Precision had an independent duty to warn. Precision undertook to provide service for the Marvel-Schebler carburetor and promoted itself and its replacement parts in the various notices and bulletins sent out to repair stations. Although it did not assume service contracts, enter into new service contracts, or actually perform service on the carburetors, it held itself out as the source of FAA-approved service information, parts catalogues, and replacement parts. The sale of replacement parts created a potential economic benefit to it from the owners of aircraft equipped with Marvel-Schebler carburetors. Furthermore, Precision clearly knew of the substantial

risk of harm posed by the failure of the carburetor due to the sinking of the composite float, and was aware of numerous incidents resulting from this failure. Precision had access to the list of owners maintained by the FAA. And the issuance of warnings to the owners, who likely were otherwise unaware of the problem and who would be at the greatest risk, would have been the most effective means of communicating the warning.

We reject plaintiffs' theory of independent liability, for a number of reasons. First, as noted, California has not adopted an independent duty to warn theory of liability. (*Gee, supra,* 615 F.2d 857.) Even if we were inclined to do so here, however, it is not warranted in the circumstances of this case. Precision does not contend that it had no duty to warn of the problems associated with the Marvel-Schebler carburetor. Precision's duties and obligations concerning this product, including a continuing duty to warn, were imposed on it by federal law. Imposing a separate and independent duty based on general principles of tort law would not only be superfluous in light of the federal statutory scheme regulating and overseeing the duties of manufacturers in the general aviation industry, but would also directly conflict with that statutory scheme. None of the cases plaintiffs rely on from other jurisdictions finding a duty to warn involve products in the general aviation aircraft industry, an industry which is regulated "to a degree not comparable to any other." (GARA, H.R. No. 103-525(II), 103d Cong., 2d Sess., *supra*, p. 1647.)

Furthermore, plaintiffs' cases discussing general tort principles do not consider the effect of products liability statutes of repose. Cases that do involve statutes of repose have routinely applied such statutes to bar claims against successor manufacturers when the claim against the manufacturer is barred. (See *Allison v. ITE Imperial Corp.* (S.D. Miss. 1990) 729 F.Supp. 45, 46; *Henry v. Raynor Mfg. Co.* (D.Minn. 1990) 753 F.Supp. 278, 279-280; *Gardner v. Navistar Intern. Transp. Corp.* (1991) 213 Ill.App.3d 242 [157 Ill.Dec. 88, 571 N.E.2d 1107, 1108, 1114]; *Frankenmuth Mut. Ins. Co. v. Marlette Homes* (1998) 456 Mich. 511, fn. 1 [573 N.W.2d 611, 612]; *Jackson v. Coldspring Terrace Property* (Tex.App. 1997) 939 S.W.2d 762, 764, 768-769 [successor to franchisor entitled to benefit of statute of repose although not involved in actual construction of product].) This is a logical application of statutes of repose, which are product based and represent a legislative determination that once a product crosses the specified age threshold, claims arising from manufacturing defects are simply no longer viable.

As discussed in the previous section, when Precision became the OEM, it stepped into the shoes of the manufacturer and took on the duties and

obligations with respect to this product which are imposed by federal law. Those duties, including a duty to warn, are coextensive with the duties of a manufacturer acting in its capacity as a manufacturer. Congress has clearly occupied the field in this area and GARA bars claims based on a breach of a manufacturer's duty to warn, as those duties are described and defined by federal law and regulated by the FAA. Furthermore, GARA would expressly preempt any claim based on state tort law establishing a manufacturer's independent duty to warn. (GARA, Pub.L. No. 103-298, § 2(d), 108 Stat. 1552.) Thus, in order to survive summary judgment, plaintiffs must raise a triable factual issue that there was negligent conduct by Precision outside the scope of the duties imposed on it by federal law as the successor manufacturer of the product. In other words, plaintiffs must show that Precision was not acting "in its capacity as a manufacturer" when it committed the acts complained of here. Nothing in plaintiffs' factual showing indicates that Precision was acting outside the scope of its duties as the successor manufacturer.

Plaintiffs argue here that their claim against Precision is based on Precision's allegedly negligent service, maintenance and repair of the MSA carburetor. Their pleadings and arguments belie this assertion. Plaintiffs sued Precision because of its relationship to the product line of allegedly defective carburetors. Precision is identified in the complaint as follows: "At all times herein mentioned, defendant Precision Airmotive Corp. was a successor corporation to Facet Aerospace Co. and Marvel Schebler Co. and had acquired their product lines. The carburetor mentioned herein was initially designed, manufactured and sold by said companies and was one of their products." In plaintiffs' responses to interrogatories, they stated that by issuing service bulletins to service centers and not to the owners, "Precision failed to confirm [sic] to the common and accepted practice *of aircraft and engine manufacturers*, such as Cessna and Lycoming, to ensure the safety and airworthiness of its products." (Italics added.) They further stated that Precision's duty to warn "arose because Precision became the Original Equipment Manufacturer in July 1990 and undertook to provide product support from Marvel Schebler carburetors, when it purchased the product line from Facet and so informed the FAA and repair stations." In their "Additional Facts" in opposition to the summary adjudication motion plaintiffs state that when Precision purchased the product line from Facet, "it then became the original equipment manufacturer, standing in the same shoes as the two prior companies with respect to providing service information and replacement parts for existing carburetors."

This record shows that Precision's duty with respect to reporting and issuing service bulletins and information was the same as its predecessors'

and derives from its status as the manufacturer, or OEM, for the product. It is precisely this duty, to provide adequate and effective service information, that plaintiffs claim was breached by Precision when it failed to send the relevant notices directly to aircraft owners. Precision is not a mechanic. It never repaired or serviced the Marvel-Schebler carburetors or acted in any capacity other than as a manufacturer carrying out its obligation to ensure airworthiness. If Precision were deemed to be acting in a capacity other than its capacity as a successor manufacturer in these circumstances, then the same could be said of its predecessors. This would render GARA a nullity, since all manufacturers issuing required service bulletins, manuals, instructions and other reporting information could be said to be acting in a capacity to service, maintain and repair the product.

GARA cannot be interpreted in a way that would eviscerate its effect. The phrase "in its capacity as a manufacturer" was intended to provide a limited exception for the situation where a party who was the manufacturer of an aircraft or of a component part also "committed some negligent act as a mechanic of an aircraft or as a pilot, and such act was a proximate cause of an accident." (GARA, H.R. No. 103-525(II), 103d Cong., 2d Sess., *supra*, p. 1649.) Precision was not acting in a role "as a mechanic" when it issued the service bulletins plaintiff claims should have been sent to the owners. We reject plaintiffs' claim that Precision *undertook* to service all Marvel-Schebler carburetors and thus stepped into the role of a mechanic. The record shows that Precision undertook what it and its predecessors were required by law as manufacturers to do, namely to report defects, issue service bulletins and provide service instructions and information.

*Schamel v. Textron-Lycoming* (7th Cir. 1993) 1 F.3d 655 (*Schamel*), supports our conclusion that the duties plaintiffs allege were breached here are the duties of a manufacturer, and that claims based thereon are barred by the running of the statute of repose. In *Schamel,* the plaintiff brought a wrongful death action against the manufacturer of aircraft engines and parts alleging that the defendant's failure to provide adequate information in its overhaul and repair manuals led to faulty repairs that in turn caused a component to fail and the plane to crash. The claim arose prior to the passage of GARA but was subject to a state products liability statute of repose, which barred all products liability actions occurring more than 10 years after the initial delivery of the product. The plaintiff's claim arose 16 years after the product was initially sold. She contended, however, that the defendant's failure to provide adequate postsale information was a separate act of negligence occurring after the sale of the product and taking the claim out of the reach of the statute of repose.

The Seventh Circuit court in *Schamel* disagreed. The court held that the issuance of service information by the manufacturer was not a separate and discrete postsale undertaking because such information is "generally necessary to satisfy the manufacturer's duty to warn." (*Schamel, supra,* 1 F.3d at p. 657.) Indeed the court observed that " 'Aircraft manufacturers ordinarily satisfy their postsale duty to warn through the issuance of service bulletins or service letters.' " (*Ibid.,* italics omitted.) The court stated "defendant had a duty to provide the service information and, thus, the provision of such information was not a voluntary undertaking distinct from the obligations inherent in the initial sale of the product. Accordingly, the plaintiff merely alleges that the defendant breached its continuing duty to warn . . . . [H]owever . . . 'an action for damages resulting from the alleged failure of a manufacturer or seller to warn a user of its product's latently defective nature is certainly a product liability action . . . .' " Thus the action was barred by the product liability statute of repose. (*Ibid.,* fn. omitted, quoting *Dague v. Piper Aircraft Corp.* (1981) 275 Ind. 520 [418 N.E.2d 207, 211, 25 A.L.R. 4th 629].)

Other cases addressing this issue are in accord. In *Alexander v. Beech Aircraft Corp., supra,* 952 F.2d 1215, the court considered whether the plaintiff had raised a factual question as to whether the manufacturer's negligent attempts to correct deficiencies in the aircraft postsale were "distinct and separate actions from the original design and manufacture of the aircraft so as to avoid the bar of the [state] statute of repose." (*Id.* at p. 1226.) The court rejected this theory of liability, finding that "any alleged negligence by [the manufacturer] of this sort should be considered as a claim of a failure to warn and this theory does not remove such claims by the plaintiffs from the bar of the state of repose." (*Ibid.*) (See also *Dague v. Piper Aircraft Corp., supra,* 418 N.E.2d 207, 212 ["Irrespective of the defendant's continuing duty to warn of any latent defects of which it had knowledge, and its alleged continuing breach of that duty, [citation], plaintiff's cause of action for such negligence did not accrue until her decedent was harmed. This, of course, occurred more than ten years after the plane was placed in the stream of commerce [and was thus barred by the applicable statute of repose"]; *Butchkosky v. Enstrom Helicopter Co.* (S.D.Fla. 1993) 855 F.Supp. 1251, 1257 ["To hold that (the manufacturer) should be liable because its manuals issued within the period of repose did not provide an adequate means of correcting the design flaw of the critical component, would be to circumvent the statute of repose by providing a back door to sue for the design flaw—ostensibly not for the design flaw itself, but for the failure of the manuals to adequately correct the flaw. The result would be the evisceration of the statute of repose. If a plaintiff is precluded by the statute of repose from suing for a design flaw in a product, the plaintiff must also be

precluded from suing for a failure to correct the design flaw, whether that failure be in the inadequacy of the text of a subsequently issued owner's manual or in repair guidelines subsequently sent to mechanics"]; *Campbell v. Parker-Hannifin Corp., supra,* 69 Cal.App.4th at p. 1547 [by alleging a failure to warn, plaintiffs were "still attempting to hold Cessna liable for actions connected with its role as a manufacturer"].)

We conclude that plaintiffs have failed to establish a negligence cause of action based on an independent duty to warn theory of liability. Precision's duty to warn derived from the duty of manufacturers and successor manufacturers of general aviation aircraft parts imposed by federal law. Product liability claims based on breach of such a duty are barred by the statute of repose contained in GARA.

## DISPOSITION

The judgment is affirmed.

Wunderlich, J., and Mihara, J., concurred.

A petition for a rehearing was denied March 23, 2000, and appellants' petition for review by the Supreme Court was denied May 24, 2000. Mosk, J., was of the opinion that the petition should be granted.