Filed 4/6/21  R.L. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Juvenile court, rule 8.1115(a), prohibits juvenile courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| R.L.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br>_____<br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Real Party in Interest. | H048650<br>(Santa Clara County Super. Ct. No. 18JD025518) |

## I.  INTRODUCTION

On December 7, 2018, the Santa Clara County Department of Family and Children's Services (Department) filed separate petitions under Welfare and Institutions Code section 300[1] concerning E.L. (born in February 2018; hereafter, the minor), and her

_____

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

half-brother, T.G.[2]  R.L. is the minor's mother.  The minor was removed from Mother's care in January 2019 due to prior instances of domestic violence between Mother and the minor's father, M.L (Father), that reportedly occurred between March 2016 and August 2018.  The minor has been a dependent of the juvenile court since May 2019.[3]

After a lengthy contested proceeding that was a combined 12-month and 18-month review hearing, the juvenile court on December 1, 2020, terminated Mother's reunification services, finding that Mother had not changed her behavior or taken accountability for her actions surrounding the domestic violence, and  she had not acknowledged that the domestic violence endangered the minor.  The juvenile court set a selection and implementation hearing pursuant to section 366.26 for March 25, 2021 (hereafter, the 366.26 hearing).

Mother seeks an extraordinary writ.  (Cal. Rules of Court, rules 8.452, 8.456.)[4] Mother asserts there was not substantial evidence to support the juvenile court's finding that returning the minor to mother's care would create a substantial risk of harm to the minor's safety, protection, and physical and emotional well-being.  Mother also argues that she was not provided reasonable reunification services.

Mother also seeks an immediate stay of the 366.26 hearing.  (Rules 8.452(f), 8.456.)  On March 24, 2021, this court issued an order staying the 366.26 hearing, with reunification services to be provided to Mother during the stay.

We conclude, after a careful review of the record and the parties' respective positions, that "the record as a whole [does not] contain[] substantial evidence from

---

[2] The Department's separate petition involving T.G. sought to declare him a dependent child under section 300, subdivisions (b)(1) and (c).  That petition, as later amended, was sustained by the court on May 3, 2019.  It is not at issue here.

[3] We affirmed the juvenile court's May 2019 jurisdiction and disposition order finding the minor to be a dependent child pursuant to section 300, subdivisions (b), (c), and (j) in *In re T.G., et al.*, (Mar. 10, 2021, H046914) [nonpub. opn.] (*In re T.G.*).

[4] All further rule references are to the California Rules of Court.

which a reasonable factfinder could have found it highly probable" that reasonable services were provided or offered to Mother in this instance. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) We will therefore grant Mother's petition for extraordinary writ.

## II. FACTUAL AND PROCEDURAL BACKGROUND[5]

### A. Initial Proceedings

In March 2018 (nine months before the petition's filing), the San Jose Police Department forwarded police reports concerning two domestic violence incidents involving Mother and Father. On March 12, Father was arrested after he punched and slapped Mother in the face and punched her in the stomach while she was holding their newborn baby, the minor. On March 21, Mother was arrested after she punched Father in the face. The minor was present in the vehicle when the incident occurred. The Department later learned of a third incident involving the police in which Father, on August 30, 2018, grabbed Mother by the neck and by her hair and pushed her into the window of a vehicle multiple times. Father's contact was in violation of a criminal protective order.

On December 7, 2018, the Department filed a petition seeking to declare the minor a dependent child under section 300, subdivisions (b)(1), (c), and (j). The minor was not removed from Mother's custody at that time. After an incident in which Mother and Father—in violation of a protective order—reportedly stayed with Father's sister for three days in January 2019 (with the minor and her brother, T.G., present), consuming alcohol to the point of intoxication during the entire stay, the Department, by a protective

_____

[5] Because of the prior appeal by Mother, we are very familiar with the facts involved in this proceeding from the filing of the dependency petition in December 2018 to May 3, 2019, the date of the juvenile court's order after the jurisdiction and disposition hearing. We take judicial notice of the opinion, and we incorporate by reference the underlying facts and procedural history recited in our opinion in *In re T.G.*, *supra*, H046914. A brief summary of those facts and that procedural history is presented herein.

custody warrant, sought and obtained the removal of the minor from Mother's care. Father, who was inside the home when the warrant was served on Mother, was in violation of the criminal protective order and was arrested. The minor was placed in the care of her maternal grandparents. Mother and Father received frequent visitation with the minor.

The Department submitted reports in connection with the jurisdiction/disposition hearing. The reports included discussion of 14 reported incidents of domestic violence between March 2016 and August 2019. Father was the aggressor in eight of the incidents, and Mother was the aggressor in six of them; all but three of the reported incidents involved physical violence. At the contested hearing, Father denied that he had ever used physical violence against Mother or had destroyed any of her property. He also denied that he had ever violated the three-year criminal protective order obtained by Mother that was effective until 2021. Mother testified that she had been a victim of domestic violence for " 'one short period' " of time during her relationship with Father. She denied having ever perpetrated physical violence upon him. Of the incidents of physical domestic violence by Father that Mother had previously reported, she testified that only one had occurred (the incident on March 12, 2018). And she testified that she had lied to the police about Father, while they were driving, having strangled her, or having grabbed her by the hair and twice slamming her head into the window.

After a lengthy evidentiary hearing, on May 6, 2019, the juvenile court found that the minor was a child described under section 300, subdivisions (b), (c), and (j). In its disposition order, the court found by clear and convincing evidence that the minor's welfare required that she be removed from the physical custody of Mother, because there was a substantial risk to the minors' physical health, safety, protection, or physical or emotional well-being that could not be protected without such removal. The court found further by clear and convincing evidence that placement of the minor with Father, as the previously noncustodial parent, would be detrimental to her safety, protection, or physical

4

or emotional well-being. In reaching its decision, the court concluded that there was " 'overwhelming evidence' " of all different forms of domestic violence between Mother and Father, and that both parties had " 'significantly minimize[d] the amount of domestic violence that was in this case.' " The court ordered reunification services for Mother and Father, including visitation with the minor.[6] Mother's case plan included completion of a parenting orientation class, a 16-week parenting without violence class, a program of counseling or psychotherapy, random alcohol/drug testing, attendance and completion of a 12-step program, a substance abuse assessment, and a domestic violence assessment.

### B.    Contested Six-Month Review Hearing[7]

The contested six-month review hearing took place over several days in January and February 2020, and the juvenile court announced its decision on February 20, 2020. The Department recommended continuing reunification services for both parents. At that time, Mother had been terminated from the parenting without violence class because she missed too many sessions, having completed 13 of the 16 required classes. The program facilitator indicated that while Mother had made some progress, she had not taken responsibility for the reasons she was referred to the class. Additionally, Mother had not enrolled in the 52-week batterer's intervention program. Mother reported to the social worker that she had completed four sessions of therapy, but the social worker was unable to confirm Mother's participation.

---

[6] The Department recommended that Mother receive supervised visits consisting of at least two visits per week, with a minimum of two hours duration for each visit. The order contains interlineations of those recommendations. Although not completely clear, it is apparent that the court's order was that Mother was to receive visits of a maximum length of 12 hours, with no indication as to the minimum number of visits per week.

[7] On February 24, 2021, the Department filed a request for judicial notice and to augment the record for extraordinary writ, pursuant to rules 8.155 and 8.410, seeking to add a status review report, dated October 29, 2019; an addendum report, dated December 2, 2019; and a second addendum report, dated January 7, 2020. We grant the Department's request to augment the record.

5

At the conclusion of trial, the juvenile court found that returning the minor to Mother's care would create a substantial risk of detriment to the child's safety, protection, and physical and emotional well-being. The court found that Mother had not made adequate progress in her case plan, because she had not started the batterer's intervention program and she had not provided proof of her progress in therapy. The court found that Mother had not accepted responsibility for the conditions that had necessitated the initiation of the dependency case. The juvenile court further found that Mother lacked accountability and insight into the domestic violence that placed the minor in danger. The court added, however, that notwithstanding Mother's lack of accountability and insight and inadequate progress in her case plan, the court saw "a lot of positives in what [Mother] is currently doing and [it] encourage[d] her to continue on the path of engaging in individual therapy and moving forward with the 52-week [batterer's intervention] class." The court noted further that it "truly [viewed] this case as one in which both parents ha[d] the potential to succeed in reunifying with [the minor] in the foreseeable future.

The juvenile court ordered continued reunification services for both parents. The order included that Mother was to receive supervised visitation with the minor of a minimum of three times a week for two hours a visit. There was, however, discussion at the hearing concerning increasing visitation and reducing the level of supervision; and the court stated that the Department had the discretion to increase the frequency and duration of visits and to step down visits to monitored or unsupervised visits. The court set the 12-month review hearing for March 17, 2020, because of the amount of time that had passed since the court took jurisdiction in May 2019.

6

### C.    Combined 12 and 18-Month Review Hearing

#### 1.    *Scheduling and Department's Reports*

Due to the COVID-19 global pandemic, on March 4, 2020, Governor Gavin Newsom declared that California was in a state of emergency[8] and issued a subsequent stay-at-home order on March 19, 2020.[9]  The Judicial Council of California issued Emergency Rule 6(c)(6) on April 6, 2020, authorizing continuances for juvenile dependency hearings due to the pandemic.[10]

The original 12-month review hearing scheduled for March 2020 was continued three times and was eventually set for July 7, 2020.  On that date, the Department requested a continuance so it could reevaluate its recommendations based upon a domestic violence incident between Mother and Father that occurred the prior month (on June 13).  Because the case had extended beyond 18 months from the time the minor had been taken into protective custody, the court set the matter for a combined 12 and 18-month status review hearing on July 31, 2020.  Because the case was contested, the hearing ultimately commenced on September 28, 2020.  At the hearing, the Department recommended that the juvenile court terminate Mother's and Father's reunification services and set the matter for a 366.26 hearing.

---

[8] Executive Department State of California Proclamation of a State of Emergency <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf> [as of Apr. 6, 2021], archived at <http://perma.cc/8EJ3-DJG5>.

[9] Executive Department State of California Executive Order N-33-20 <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf> [as of Apr. 6, 2021], archived at < http://perma.cc/B4QW-USEU>.

[10] Judicial Council of California Amendments to the California Rules of Court <https://www.courts.ca.gov/documents/2020-04-06-rules-effective-04-06-2020.pdf> [as of Apr. 6, 2021], archived at < http://perma.cc/854J-XXP9>.

The Department reported that on June 13, 2020, there was a domestic violence incident between Mother and Father. Father had been driving Mother to her car after an unauthorized visit with the minor when he punched her twice in the face and pulled her out of the car by her hair. Father left before police arrived. Father denied any involvement in the incident, telling the social worker that he never saw or talked to Mother that day and that Mother was lying about everything. Mother initially denied the incident to the social worker, saying that she had been in a car accident; however, Mother later admitted that she had an unauthorized visit with the minor and that Father had hit her in the face while the two were in the car together.

In the report prepared for the hearing, the Department noted that in March 2020, Mother had started seeing a new therapist, Michelle Ho, who specialized in domestic violence. Also in March, the Department, due to the emergency orders associated with the COVID-19 pandemic, changed visitation so that Mother's in-person visits with the minor became five video visits per week. In June 2020, Mother enrolled in the 52-week batterer's intervention program. Mother was terminated from the parenting without violence class in July 2020 because the June 2020 domestic violence incident violated the class agreement. The facilitator explained to caseworker Anh Nguyen that although Mother had asserted she was the victim in the incident, the program rules required termination whether the participant was the victim or perpetrator. The facilitator added that Mother had been a good participant in the class. The caseworker tried to refer Mother to another parenting without violence class, but Mother refused to sign the referral.

Mother and Father disagreed with the Department's recommendation that services be terminated and requested a contested hearing.

### 2. *Combined 12-Month/18-Month Review Hearing*

The contested 12-month/18-month review hearing was held over four days in September, October, and November 2020. During the hearing, the court heard from a

number of witnesses, including Michelle Ho (Mother's therapist)), Mica Fuller (course director of Mother's batterer's intervention program), Anh Nguyen (assigned social worker), Rosa Baumgartner (mother's expert on reasonableness of reunification services), Ross Matsushima (social worker's supervisor), and Mother.

### a.     Michelle Ho, LMFT

Michele Ho, a licensed marriage and family therapist (LMFT), testified that she had been conducting individual therapy sessions with Mother since March 2020.  Ho reported that Mother had been cooperative and very motivated.  Mother had spent much of the sessions talking about how she could become a better or more effective parent.  Ho testified that she and Mother often talked about the problems in Mother's relationship with Father; Ho believed that Mother had taken accountability for those problems.  Mother also acknowledged to Ho that the children had been present during some of the domestic violence incidents that had occurred before the filing of the dependency petition in late 2018.  Ho testified that Mother had not reported any new domestic violence incidents during the time they had been working together.  Mother briefly discussed the June 13, 2020 incident with Ms. Ho, but she had said that no violence had occurred.

Ho testified that Mother was a stable person—she maintained full-time employment, was a part-time student, and worked on her case plan.  It did not appear to Ho, from the six months of her therapy sessions with Mother, that she had a substance abuse issue.  And based on the therapy sessions, Ho did not believe that the minor would be at risk in Mother's care; however, Ho had not reviewed any of the court reports the social worker had sent her about the case.

### b.     Mica Fuller, LMFT

Mica Fuller, an LMFT, has been a facilitator of domestic violence batterer's intervention groups for more than 20 years.  She was the facilitator of the 52-week batterer's intervention course that Mother was attending as of the time of the hearing.  Fuller testified that Mother was "doing quite well in the program," and she had attended

9

18 sessions. Fuller indicated that Mother had "cooperated all along the way," she was an active participant in class, "had a new awareness," and had shared examples in class from her life. Mother had specifically discussed in class the June 2020 domestic violence incident, and she had been "transparent" about it.

### c.     Social Worker Anh Nguyen

The social worker for the case, Anh Nguyen, testified as an expert in risk assessment and child welfare services. Nguyen said that she had been in regular contact with Mother, exchanging up to 20 e-mails per week. Nguyen reported that Mother had completed 16 sessions of the 52-week batterer's intervention program and the program's facilitator reported that Mother was doing well and making progress. Nguyen also testified that Mother was attending therapy, but Nguyen was concerned that Mother had not told her therapist that Father had been violent with her during the June 2020 incident.

Mother initially told Nguyen that she had been in a car accident on June 13. Within days thereafter, Mother "self-report[ed]," telling Nguyen that there had been a domestic violence incident in which the police responded and she had made a report.

Nguyen testified that the Department had not conducted any Child and Family Team (CFT) meetings with Mother because it was the Department's policy not to do so during contested proceedings. A CFT "means a group of individuals who are convened by the placing agency and who are engaged through a variety of team-based processes to identify the strengths and needs to the child or youth and their family, and to help achieve positive outcomes for safety, permanency, and well-being." (§ 16501, subd. (a)(4).) Nguyen testified that the decision to hold a CFT meeting in Mother's case was not one for Nguyen to make; she deferred to her supervisor, Ross Matsushima. Nguyen testified that she "would like to have a meeting with [Mother]." She testified that, as an alternative to a CFT meeting, she offered to meet with Mother and Matsushima to discuss any concerns Mother had about her case.

Nguyen acknowledged that visits were an important part of reunification services. Nguyen testified that Mother had not received in-person visitation of the minor for a three-month period of March to mid-June 2020. In-person visitation was suspended in March due to the COVID-19 pandemic by the Department. Nguyen understood that there was initially "a court order" preventing in-person visitation which the Department followed, but that by mid-April, there was "another order" in which in-person visitation in dependency cases would be allowed on a case-by-case basis based upon the Department's assessment. Nguyen, in consultation with Matsushima, assessed whether in-person visitation between Mother and the minor should resume. Mother had no in-person visits with the minor in April or May 2020. The failure of the Department to arrange such visits during that period, according to Nguyen, was not due to safety concerns.

### d.     Social Work Supervisor Ross Matsushima

Ross Matsushima, Nguyen's supervisor, testified as an expert in risk assessment and child welfare services, as well as intimate partner violence.

Matsushima stated that although Mother had participated in some of her services and received positive reports from her service providers, Mother had not demonstrated that she had changed her behavior based on what she may have learned from her services. Matsushima was concerned that Mother had not been honest with Nguyen about what had happened between her and Father in June 2020, and that she had continued to minimize the domestic violence that had occurred between them. Because Mother had continued to minimize the domestic violence incidents and had not taken responsibility for her actions, Matsushima believed that the minor would be at risk if she were placed in Mother's care.

Matsushima confirmed that the Department had not conducted any CFT meetings for Mother's case plan for more than one year. This was based upon Department policy not to hold CFTs if the matter is contested. He stated that there was no CFT meeting here

11

due to "the case [being] in trial mode and we've been advised that it's not kind of in the best interest to have it during that time . . . where parties are not in agreement with the current plan for the children." Matsushima testified that ideally it is the "goal" to have CFT meetings, and he "would have hoped that [CFT's] could have happened."

### e. Rosa Baumgartner (MSW)

Rosa Baumgartner has a Master's Degree in Social Work and has been an independent social worker for 19 years. Baumgartner offered her testimony as an expert on reasonable services. Based upon her review of the case file, Baumgartner opined that the Department had not provided reasonable services to Mother. She based this opinion upon four general areas.

First, Baumgartner concluded that it had not been reasonable to have terminated mother from the parenting without violence course because of the June 2020 domestic violence incident involving Father. This opinion was based upon the fact that Mother, after almost completing the course, was terminated without having been given any cautionary warning. In such situations, Baumgartner typically saw the issues treated by the agency and the service provider "as a learning situation and also as a relapse situation," rather than as an event resulting in termination of the services.

Second, Baumgartner's opinion that reasonable services were not provided was founded upon the Department's dealings with the "collaterals" (i.e., service providers). She testified that the "collaterals" had a difficult time communicating their assessments because the Department was asking for them at the last minute before hearings. Additionally, Baumgartner expressed concern that the case worker was not calling the collaterals, including the sponsor of the 52-week batterer's intervention course, to find out about Mother's progress, attendance, amount of work assigned, curriculum, etc.

Third, Baumgartner opined that the Department did not provide reasonable services as to therapy. Specifically, it did not reflect in its reports any information provided by the collaterals concerning the progress Mother had made in therapy.

12

Fourth, Baumgartner testified that the Department had not provided reasonable services regarding CFT meetings. The Department had not scheduled a CFT meeting for one year, despite Mother's repeated requests to obtain direction about her case plan, an assessment of her progress, and an opportunity to participate in her case plan. She testified that the CFT meeting is a "very important" component of the reunification process, because it affords the parent the chance to be kept informed of her progress with the case plan; provides "a check and balance between the client and . . . the Department"; gives a chance for all parties "to exhaust services"; and provides an opportunity for growth for all parties.

Touching upon two areas of Mother's case plan performance, Baumgartner testified that she was aware that Mother had attended in 2019 a batterer's intervention course, completing 13 of 16 classes, and she had also attended a different batterer's intervention class in 2020 in which she had attended nine of 16 classes before having been terminated due to the June 2020 domestic violence incident. Baumgartner testified that Mother had substantially complied with this case plan requirement. Baumgartner acknowledged that Mother was currently complying by attending a new batterer's intervention course, and that the facilitator, Richard Garcia, had given a positive report concerning her participation. Baumgartner testified further that from her review of the case file, Mother's participation in visitation had been positive. The records showed that several social workers had commented on the existence of uniformly positive interactions, attachment, and bonding. In reaching her opinion concerning the level of Mother's compliance with her case plan, Baumgartner gave consideration to the potential obstacles that the pandemic had posed to those efforts. Baumgartner "was impressed with" Mother's efforts to locate the collaterals and attend courses and be on time for them despite the pandemic.

### f. R.L. (Mother)

13

As of the time of the hearing, Mother had been working for more than one year as a surgery scheduler for Stanford Hospital. She provided the Department with a copy of her annual employment review which had "[n]othing but positive statements." Her caseworker did not discuss the review with her and did not attach it to any reports to the court.[11]

Mother testified that she was currently attending a 16-week parenting without violence course facilitated by Richard Garcia, and she had completed 11 or 12 classes. She had attended a previous course but was terminated after the June 2020 domestic violence incident; she challenged that termination.

Mother testified about the June 2020 domestic violence incident. Mother explained that Father had called her and offered to arrange an unsupervised visit with the minor. She said she knew it would be wrong to do so, but she accepted the offer because she had not seen her daughter for three months. After the visit, when Father was driving Mother back to her car, they got into an argument. Father punched Mother in the face twice while driving; he then stopped the car, came around to the passenger's side, and pulled her out of the car by her hair. The minor was not present during the incident. The San Jose Police responded, and Mother reported the incident.

Mother testified that she had initially told the social worker by e-mail that she had been in a car accident because she "was scared of the repercussions towards stating that [she] was a victim in another domestic violence incident." Mother testified that the incident would not have happened if she had been given "fair visitation" with the minor. Within approximately three days, Mother reported to the social worker in a fairly lengthy

---

[11] In an Addendum Report II of September 22, 2020, the Department noted that Mother had sent it a copy of her annual performance review, indicating that it was attached to the report. The record does not reflect that the review was attached to the Addendum Report II.

14

telephone conversation that she had been a domestic violence victim in an incident with Father.

### 3.     *The Court's Order Terminating Reunification Services*

On December 1, 2020, the juvenile court considered the evidence and ordered reunification services terminated for Mother and Father and set a 366.26 hearing for March 25, 2021.

The court found that while Mother had made progress in her case plan, she had not shown insight into the risk domestic violence had on the minor and she had not taken responsibility for her actions. In addition to the social worker's testimony, the court considered the June 2020 domestic violence incident as evidence that Mother had "failed to show behavioral changes that would suggest a capacity to prevent domestic violence from recurring." The court noted that Mother had initially lied to the social worker about the incident and had told her therapist that there was no violence during the altercation with Father. The court found that Mother's behavior had not changed since the six-month review hearing in February 2020.

The juvenile court found by a preponderance of the evidence that returning the minor to Mother would create a substantial risk of harm to the minor's safety, protection, and physical and emotional well-being. Further, the juvenile court found by clear and convincing evidence that the Department had provided reasonable services to both Mother and Father. And the court concluded that there was not a substantial probability that the minor would be returned to the physical custody of Mother within 24 months of the initiation of protective custody.

## III.  DISCUSSION

Mother presents two main arguments in challenging the juvenile court's order terminating reunification services. First, Mother argues that the court erred in concluding

15

that there was substantial evidence that returning the minor to her custody would create a substantial risk of harm to the child.  Second, Mother contends that there was no substantial evidence upon which the juvenile court could have found by clear and convincing evidence that the Department had provided or offered reasonable services.

We will address Mother's second argument.  Because we conclude it has merit, we will not consider Mother's assertion that the juvenile court erred in finding that the return of the minor to Mother's custody would create a substantial risk of harm to the child.  (See *Hiser v. Bell Helicopter Textron Inc.* (2003) 111 Cal.App.4th 640, 655 [appellate court will generally "decline to decide questions not necessary to the decision"].)

## A.     Applicable Law

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family.  (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303.)  As explained by one court:  "The importance of reunification services in the dependency system cannot be gainsaid.  The law favors reunification whenever possible. [Citation.]  To achieve that goal, ordinarily a parent must be granted reasonable reunification services.  [Citation.]"  (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Prior to the 366.26 hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months.  (§ 366, subd. (a)(1).)  Under section 366.21, subdivision (e)(1), at the six-month review hearing, the juvenile court must return the child to the parents' physical custody unless the court finds, "by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  The agency bears the burden of establishing such detriment. (*Ibid.*)  "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence

16

that return would be detrimental." (*Ibid.*) Because they are conducted at a stage when the juvenile court may deny further reunification services to the parent, "[r]eview hearings are critical." (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 61.)

At the review hearing, the juvenile court may continue the case for up to six months for a permanency review hearing as long as that hearing occurs within 18 months of the child's removal. (§ 366.21, subd. (g)(1).) The court may do so, however, "only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (*Ibid.*) The court's finding that there is a substantial probability that the child will be returned to the home constitutes "a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interests of the child." (§ 366.21, subd. (g)(1)(C)(i).) In any event, "[t]he court shall not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (g)(1)(C)(ii).) The Department bears the burden of proving by clear and convincing evidence that it provided or offered reasonable reunification services to the parent. (§§ 366.21, subd. (g)(1)(C)(ii); 366.22, subd. (a)(3).)

Section 361.5, subdivision (a) provides in pertinent part: "For a child who, on the date of initial removal from the physical custody of the child's parent . . . , was under three years of age, court-ordered services shall be provided for a period of six months . . . but no longer than 12 months from the date the child entered foster care. [¶] . . . [¶] . . . [C]ourt-ordered services may be extended . . . not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent . . . . The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period or that reasonable services have not been provided to the parent."

17

Based on a child's need for security and stability, the 18-month review hearing is the cutoff date for family reunification services. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) "At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children. [Citation.]" (*Ibid.*)

The juvenile court may offer more than 18 months of reunification services if it finds that reasonable reunification services have not been provided or offered. (*In re M.F.* (2019) 32 Cal.App.5th 1, 21.) At the conclusion of the review period, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a).)

The agency must design the reunification services " 'to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' [Citation.]" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.) " ' "[T]he record should show that the [Department] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.]" (*Id.* at p. 697.) One of the components of a reunification plan must be visitation, which must "be as frequent as possible, consistent with the well-being of the minor. [Citation.]" (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679; see also *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1114-1115, dis. opn. of Rothschild, J. ["Visitation is a critical component, probably the most critical component, of a reunification plan."])

18

The services offered by the agency must be "reasonable 'under the circumstances.' Such circumstances necessarily include the mental condition of the parent, her insight into the family's problems, and her willingness to accept and participate in appropriate services." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) Under section 361.5, the agency is required to make " '[a] good faith effort' to provide reasonable services responding to the unique needs of each family. [Citation.]" (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.) But a good faith effort is not the equivalent of perfection: "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The adequacy of the Department's plan for reunification and the reasonableness of its efforts must be determined by the circumstances of the particular case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)

### B.     Standard of Review

We review the court's findings here at the combined 12-month/18-month review hearing for substantial evidence. (See *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535 [12-month review hearing]; *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598 [18-month review hearing].) In reviewing the challenged findings, we examine the record in the light most favorable to the juvenile court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the requisite findings. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.) We construe all reasonable inferences and resolve all conflicts in favor of the court's findings. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75)).) Issues of fact and credibility are the sole province of the juvenile court. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

19

As noted, the court's finding at the review hearing that the agency provided or offered reasonable services to the parent must be based upon clear and convincing evidence. (§§ 366.21, subd. (g)(1)(C)(ii); 366.22, subd. (a)(3).)[12] A reviewing court will uphold a finding based upon clear and convincing evidence if "the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true"—in this instance, that reasonable services were provided or offered to Mother. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011-1012; see also *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [*Conservatorship of O.B.* standard applies to findings by clear and convincing evidence in dependency proceedings].)

### C. Reasonable Reunification Services

The juvenile court concluded, based upon clear and convincing evidence, that the Department had provided or offered reasonable services to Mother. The court noted that Mother had raised issues regarding the lack of in-person visitation she had received, focusing on the first two and one-half months after County-wide shelter-in-place orders resulting from the COVID-19 pandemic. The juvenile court observed further that Mother's challenge to reasonable services was based on the Department's failure to conduct CFT meetings concerning her case plan. The court rejected Mother's arguments. The juvenile court reasoned that "[t]he law does not require the Department to exhaust every possible, theoretical service, [but] it requires that the Department offer services that are designed to address problems that gave rise to the dependency case, maintain reasonable contact with the parents and make reasonable efforts to assist parents." The

---

[12] As noted by the Department, while section 366.22 does not specify a standard of proof regarding the reasonable services finding, the Department had requested that the juvenile court make such finding by clear and convincing evidence. The clear and convincing standard applies at a 12-month review hearing, and here a separate 12-month review hearing did not take place--rather, the contested hearing was a combined 12-month and 18-month review hearing. (See § 366.21, subd. (g)(1)(C)(ii).)

juvenile court concluded that the Department had satisfied its obligation to provide reasonable services to Mother.

### 1. Visitation

As noted, visitation is a critical aspect to the provision of services. (See *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691 [parent-child visitation "is an essential component of a family reunification plan"].) The assigned caseworker, Nguyen, acknowledged this unassailable principle.

There is no question here that the COVID-19 pandemic had a significant negative impact on Mother's visitation with the minor. She had no in-person visitation for three months after the County's initial shelter-in-place order. Caseworker Nguyen testified that in-person visitation was not authorized during the first few weeks of the shelter-in-place order; by mid-April, however, in-person visitation in dependency cases was permitted on a case-by-case basis. Nguyen, in consultation with her supervisor, Matsushima, assessed whether the Department should facilitate the resumption of in-person visitation between Mother and the minor. But during April and May 2020, the Department did not authorize any in-person visits between Mother and the minor. During this period, Nguyen did not communicate with Mother that she was having trouble setting up such visits. And, according to the testimony of Nguyen, this declination of in-person visits was not based upon safety concerns.

From our careful review of the record, there is no clear explanation for the Department's failure to arrange for in-person visitation between mid-April and June 13 (the day ultimately scheduled for the resumption of in-person visitation). There was some indication from Nguyen that the Department considered family-supervised visitation—which was potentially very appropriate here since the minor was living at the time with paternal relatives and being cared for by the paternal uncle and his partner—but the Department did not approve it because "this case is so complex." Nguyen also testified that in-person visitation matters went through "the scheduler." There was no

specific testimony indicating that Mother was unable to receive in-person supervised visits because of the unavailability of professional supervisors. Nguyen testified that "[t]here was a lot of uncertainty happening during that time." This court acknowledges this uncertainty and does not minimize the challenges the pandemic presented to the Department. But the fact remains that the Department did not facilitate any in-person visits between Mother and the minor in April or May. Nor did the Department provide a clear explanation at the hearing why it did not do so.

There can be no question that the absence of in-person visitation had a significant negative impact here. Mother testified that because of the absence of in-person visits, she yielded to the temptation when Father offered in June 2020 to arrange for an in-person, unsupervised visit with the minor. This decision ultimately led to the June 13 domestic violence incident in which Father, as determined during a Department investigation, was the perpetrator. Although Mother made a very unwise choice—and the Department had every reason to be concerned about that choice and Mother's initial communication with the Department that she had been involved in a car accident—this court understands that Mother's explanation is that it was an emotional response to having been separated for three months from her young child.

Further, the fact that the Department arranged for virtual visits between Mother and the minor between March and May did not adequately addressed the absence of in-person visitation. As stated in one recent case, "We can all appreciate now, in the midst of the COVID-19 quarantine, that video meetings are not an adequate substitute for meeting in person, even for adults. That's even more true for children, especially small children, who aren't cognitively developed enough to engage in that setting." (*In re S.S.* (2020) 55 Cal.App.5th 355, 377.)

The lack of progress regarding in-person visitation with the minor, including the progression toward unsupervised visitation for Mother, is also concerning. Mother testified that she was living with her parents, and that there was an extra bedroom

22

available should the Department grant her overnight unsupervised visitation with the minor. According to Matsushima, the Department did not authorize unsupervised visitation for Mother because "unsupervised visits are kind of a process where we want to make sure that parents are showing substantial engagement in their services and that they're . . . learning from their services and then we can kind of assess when it's time to step down. Usually that occurs at about a three[-]month mark where we talk about stepping down visits." Although we acknowledge the June 2020 domestic violence incident in which Mother was not the perpetrator, the record does not show that after the six-month review hearing on February 20, 2020, there were any other specific events or actions by Mother that raised concern about her ability to safely care for the minor. Further, Mother and Father had not been in a relationship together for some time. Additionally, the record shows that Mother was substantially engaged in her case plan. Indeed, the juvenile court found that Mother had made substantive progress on her case plan. And the Department pointed to no issues of concern with respect to Mother's visits with the minor. While we credit the Department's assessment that Mother had not sufficiently taken responsibility for the domestic violence that had led to the dependency proceeding, the Department does not adequately explain why more consideration was not given to in-person and unsupervised visits. (Cf. *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1242 [delay in providing necessary services may serve as basis for finding that no reasonable services were offered].)

### 2. *CFT Meetings*

The record is clear that the Department—despite Mother's repeated requests—did not hold any CFT meetings concerning Mother's case plan for a period of at least a year before the combined 12-month/18-month review hearing. The explanation for not doing so was that it was the Department's policy not to conduct CFTs for a case that was in "contested" mode. This policy notwithstanding, caseworker supervisor Matsushima

23

himself admitted that ideally it is the "goal" to have the CFT, and he "would have hoped that [CFTs] could have happened."

Mother presented expert testimony by Baumgartner concerning CFT meetings and their significance. The CFT meeting is a "very important" aspect of reunification. The meeting, inter alia, allows the parties to track the recommendations that have been made and the participation and progress that has occurred. The CFT provides "a check and balance between the client and . . . the Department," and gives a chance for all parties to grow and "to exhaust services." The CFT meeting is also a mechanism by which the Department can give the client the opportunity to learn and expand.

The juvenile court found the Department's reason for not conducting a CFT meeting with Mother to have been "plausible." We disagree. The fact that the case was in "contested" or "trial" mode here does not appear, at least from the record before us, to have justified the denial of CFT meetings with Mother. The holding of CFT meetings, Matsushima admitted, was the "goal," and he "would have hoped that [CFTs] could have happened." Holding a CFT meeting, for instance, could have provided (1) the Department with information concerning challenges Mother was experiencing; (2) a vehicle in which the Department and Mother could determine whether additional services were needed to help Mother reunify; (3) Mother with necessary feedback from the Department regarding her progress with her case plan and any specific issues that needed to be addressed; and (4) an opportunity for the parties to discuss important goals toward reunification, such as the likelihood, timing, and mechanics of moving toward unsupervised visitation. The third example—necessary feedback from the Department— appears particularly relevant here. The Department's chief criticisms of Mother's performance were that she had minimized the significance of the past domestic violence and its negative impact upon her children, and she had failed to take accountability or responsibility for her role that led to the dependency proceedings. At trial, Mother

24

testified that Nguyen had advised her that her lack of accountability was a problem, but Mother stated that she was unclear what her caseworker meant by this.

Based upon evidence in the record regarding the general importance of the CFT meeting, it can be inferred that the absence of a CFT here had a potential negative impact upon reunification. The court here, however, rejected Mother's contention that the Department should have held a CFT meeting, concluding that Mother had not proved that, had the CFT been offered, it "would have made any difference in this case." However, it is not Mother's burden to show that reasonable services were *not* provided; it is the Department's obligation to prove, by clear and convincing evidence, that it *did* provide reasonable services.

Our review of the juvenile court's determination that reasonable services were provided or offered is based upon a consideration of "the evidence [in a light] most favorably to the prevailing party and [we] indulge in all legitimate and reasonable inferences to uphold the court's ruling." (*Kevin R. v. Superior Court*, *supra*, 191 Cal.App.4th at p. 691.) In light of the circumstances we have discussed concerning the Department's efforts concerning visitation and its failure to provide a CFT meeting to Mother for more than one year, we cannot conclude that the juvenile court's reasonable-services finding was supported by substantial evidence. Given the heightened evidentiary standard that the Department was required to satisfy by clear and convincing evidence, we conclude that "the record as a whole [does not] contain[] substantial evidence from which a reasonable factfinder could have found it highly probable" that reasonable services were provided or offered to Mother in this instance. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.)

### D. Conclusion

We observe from the record before us—and based upon our familiarity with the earlier record presented in *In re T.G.*, *supra*, H046914—that this has been, and continues to be, a very difficult and contentious dependency proceeding. The parties have not at all

25

times worked cooperatively together. Mother has at times been evasive, difficult, and often not acting in her best interest to progress toward reunification.

These issues aside, what is apparent to this court is that successful reunification between Mother and the minor, with significant dedication by all parties, may be achievable with additional reunification services. Mother in the last reporting period has been significantly engaged in her case plan, including attendance at a batterer's intervention class, a parents without violence class, and regular counseling. It is also apparent that within the last reporting period, there were identifiable issues—limited visitation and the absence of CFT meetings—from which a finding that reasonable services were provided or offered was not supported by substantial evidence. This problem with services may have negatively impacted Mother's progress on the path toward reunification with the minor.

We have no doubt that the COVID-19 pandemic had a direct and significant negative effect upon the parties, including the Department's ability to provide services and Mother's performance of her case plan. We therefore do not believe it appropriate or in the interests of justice, under the circumstances of this case, that Mother's services be terminated at this time.

The order terminating reunification services for Mother and setting a 366.26 hearing is vacated. The juvenile court is directed to enter a new order that Mother shall be provided reasonable reunification services for a minimum of six additional months.

## IV.   DISPOSITION

The petition for an extraordinary writ is granted. Let a peremptory writ of mandate issue directing respondent superior court to (1) vacate its finding that reasonable reunification services were provided or offered to Mother, R.L., (2) vacate its December 1, 2020 order terminating reunification services and setting a permanency and planning hearing under Welfare and Institutions Code section 366.26, and (3) enter a new and

26

different order finding that reasonable reunification services were not provided or offered to Mother, R.L. and ordering the Department to provide Mother with an additional period of reunification services for a minimum of six months. This court's stay order shall remain in effect until this decision is final. This opinion is made final as to this court after seven days of the date of its filing. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2).)

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

ELIA, J.

*R.L. v. Superior Court*
**H048650**